**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BURGERS ARE FUN LLC D/B/A WES BURGER 'N' MORE, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>MCCAIN FOODS USA, INC.; LAMB WESTON HOLDINGS, INC.; LAMB WESTON, INC.; LAMB WESTON BSW, LLC; LAMB WESTON/MIDWEST, INC.; LAMB WESTON SALES, INC.; MCCAIN FOODS LIMITED; J.R. SIMPLOT CO.; CAVENDISH FARMS LTD; and CAVENDISH FARMS, INC.,<br><br>      Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff BURGERS ARE FUN LLC D/B/A WES BURGER 'N' MORE, on behalf of itself and in a representative capacity on behalf of a Class of indirect purchasers of Frozen Potato Products, under Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, as well as State antitrust and trade regulation statutes, and common law unjust enrichment, make this Complaint for relief against Defendants for their conspiracy to fix prices of frozen french fries, tater tots, hash browns, and other frozen potato products ("Frozen Potato Products") in the United States from at least as early as January 1, 2021, through the date by which the anticompetitive effects of its violations of law shall have ceased, but in any case no earlier than the present (the "Class Period"). Based upon personal knowledge, information and belief, and investigation of counsel, Plaintiff alleges:

## I.     NATURE OF THE ACTION

1.     Plaintiff and members of the Class whom it seeks to represent overpaid for Frozen Potato Products by reason of Defendants' price-fixing conspiracy. Defendants are the four dominant processors of Frozen Potato Products sold in the United States. Together, they control more than 97% or more of the $68 billion per year Frozen Potato Products market.

2.     Defendants abused their collective market power by conspiring to overcharge and actually overcharging Plaintiff and the Class whom it seeks to represent for their Frozen Potato Products, unjustly enriching themselves at the expense of Plaintiff and members of the Class.

3.     By at least the start of 2021, Defendants conspired to fix the prices of their Frozen Potato Products above competitive levels. Defendants implemented lockstep price increases that allowed them to realize unprecedented margins. This conspiracy continues as have price increases of more than 50%, despite the fact that the costs of raw potatoes have declined significantly.

4.     In 2021 and again in the spring of 2022, while facing increased input costs, Defendants agreed to change their pricing methods to collectively impose "strong arm" price hikes with no worry their customers could defect to competitors. Frozen Potato Product prices climbed 47% from July 2022 to July 2024. In contrast to their own sales prices, Defendants' input costs peaked in 2022 and fell steadily after that.

5.     Following Defendants' series of matching price increases, in April 2022, one restaurant owner remarked that it was "[a]mazing how all of the major suppliers for french fries and the like are all raising their prices at the same time and by the same amount."

6.     Meanwhile, Defendants' conspiracy resulted in unprecedented margins. In 2023, the former VP of International at Lamb Weston acknowledged that Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history of the potato industry." The

reason for this success was, as he explained, that Defendants "absolutely" have "no incentive to fight that hard for each other's share"; instead, they are all "behaving themselves" in order to maintain high margins.

7.      And because of their agreement, Defendants had complete confidence in their ability to sustain their prices. A former Senior Director for McCain Foods commented in 2024 that McCain was unwilling to compete with Lamb Weston on the price of battered fries. He said that he originally thought McCain should compete and pursue additional market share, but "the higher ups in the room" advised not to do it.

8.      Likewise, J.R. Simplot's Director of Sales noted that customers threatened to switch to one of Simplot's competitors after Simplot increased its prices, "but we knew we weren't worried about it."  In short, Defendants had confidence in their commitment to each other; they knew their co-conspirators would not undercut them on price.

9.      And to conceal their conspiracy, upon information and belief, at least Lamb Weston told its managers to communicate about competitor pricing and business intelligence using texting instead of emails to avoid creating emails that could be discovered in the event of an antitrust investigation. Although Lamb Weston managers obtained their competitors' price announcements, they were forbidden to email such announcements to C-suite executives so the latter could more plausibly deny receiving information about the announcements.

10.      Defendants were able to successfully implement lockstep price increases and collusively increase prices because the industry is structurally susceptible to collusion. The Frozen Potato Products Market features highly concentrated sellers, high entry barriers, fragmented buyers, repetitive purchases, inelastic demand, and opportunities to collude through  common  co-packing arrangements, trade association events, and mechanisms to

exchange market share and likely other information enabling Defendants to implement and monitor their conspiracy.

11.     But for their conspiracy and unlawful acts in furtherance, Plaintiff and members of the Class would have paid less for Frozen Potato Products than they did during the Class Period.

12.     Plaintiff brings this action for redress of the injury and damages it and members of the Class have suffered and continue to suffer by reason of Defendants' past and continuing violations of law, including for damages, injunctive relief, and disgorgement of Defendants' ill-gotten gains into a common fund from which it and members of the Class may obtain restitution.

## II.     PARTIES

### A.     Plaintiff

13.     Burgers Are Fun LLC is a California corporation located in San Francisco, California. Burgers Are Fun LLC owns and operates Wes Burger 'N' More in San Francisco, California.

14.     Burgers Are Fun LLC d/b/a Wes Burger 'N' More ("Plaintiff") purchased Frozen Potato Products indirectly from at least one Defendant in California, United States, during the Class Period.

15.     Plaintiff was injured in its business or property as a direct, proximate, and material result of Defendants' violations of law.

16.     Plaintiff is threatened with future injury to its business or property by reason of Defendants' continuing violations of law, absent Court intervention.

B.      **Defendants**

1.      **Lamb Weston Defendants**

17.     Defendant Lamb Weston Holdings, Inc. is a Delaware corporation with its headquarters in Eagle Idaho. Lamb Weston Holdings, Inc. is a leading producer, distributor, and marketer of value-added Frozen Potato Products. Lamb Weston Holdings, Inc. stock is traded as "LW" on the New York Stock Exchange. Lamb Weston Holdings, Inc. began as part of Conagra Brands, Inc., which spun off Lamb Weston Holdings, Inc. to Conagra shareholders in 2016.

18.     Lamb Weston Holdings, Inc. owns and operates several United States subsidiaries, including Lamb Weston, Inc. (a Delaware corporation), Lamb Weston BSW, LLC (a Delaware LLC), Lamb Weston/Midwest, Inc. (a Washington corporation), and Lamb Weston Sales, Inc. (a Delaware corporation). These subsidiaries are included in the consolidated financial statements of Lamb Weston Holdings, Inc., indicating Lamb Weston Holdings, Inc. wholly owns and controls them and operates them as a unitary enterprise. On information and belief, Lamb Weston Holdings, Inc., conducts its Frozen Potato Products business in the United States through these subsidiaries, including manufacturing, pricing, and selling Frozen Potato Products in the United States. Lamb Weston's publicity for product purchasers and investments refers to "Lamb Weston" or "Lamb Weston Holdings, Inc." Accordingly, hereinafter this complaint refers to Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. collectively as "Lamb Weston."

19.     Lamb Weston sells its Frozen Potato Products in North America to quick-service and full-service restaurants, food service distributors, non-commercial channels, and retailers. Its products include Frozen Potato Products, commercial ingredients, and appetizers sold under the Lamb Weston brand name, as well as under other brands owned or licensed by Lamb Weston,

and private label products. Its North American segment sales for fiscal year 2023 was $4.2 billion.

20.     Lamb Weston operates twenty-seven production facilities for its products and sources its products pursuant to "co-packing" agreements, "a common industry practice in which manufacturing is outsourced to other companies."

### 2.     McCain

21.     Defendant McCain Foods Limited is a corporation organized under the laws of New Brunswick, Canada, with its corporate headquarters in Toronto, Canada. McCain Foods Limited operates forty-seven sites on six continents. McCain Foods Limited states that it owns United States patents. McCain Foods Limited owns over 50 United States trademarks.

22.     McCain Foods Limited is a privately owned company, with global revenues in excess of $14 billion Canadian dollars, and a dominant producer of Frozen Potato Products. It is one of the world's largest manufacturers of french fry and potato products, and it boasts that one in four "fries in the world is a McCain Foods fry."

23.     McCain Foods Limited operates its United States operations through its subsidiary, McCain Foods USA, Inc.

24.     McCain Foods USA, Inc., is a subsidiary of McCain Foods Limited, incorporated in Maine, and has its corporate headquarters and principal place of business at One Tower Lane, 11th Floor, Oakbrook Terrace, Illinois, within the Northern District of Illinois. According to the Illinois Secretary of State, McCain Foods USA, Inc.'s registered agent in Illinois is CT Corporation System's office in Chicago, Illinois. McCain Foods USA, Inc. provides frozen potato and other snack foods "primarily for foodservice customers, retail grocers and private label brands in restaurants and supermarket freezers nationwide" in the United States.

25.     McCain Foods Limited and McCain Foods USA, Inc., are collectively referred to as "McCain."

### 3.     J.R. Simplot

26.     Defendant J.R. Simplot Company is a Nevada Corporation with its headquarters in Boise, Idaho. J.R Simplot, a privately owned company with over 13,000 employees worldwide, claims to be one of the world's largest producers of french fries. J.R. Simplot Company sells Frozen Potato Products in this District, throughout the State of Illinois, and elsewhere in the United States. J.R. Simplot is the exclusive manufacturer and supplier of the Kraft-Heinz frozen potato brand, Ore-Ida. Ore-Ida is the leading brand of at-home Frozen Potato Products. J.R. Simplot has admitted in other litigation about Frozen Potato Product patents that it sells products in this District, and that this District and the State of Illinois may exercise personal jurisdiction and venue over J. R. Simplot. Its other businesses include food brands, phosphate mining, farming, ranching, and fertilizer manufacturing. Its 2023 revenue was $9.8 billion. J.R. Simplot Company is referred to hereinafter as "J.R. Simplot."

### 4.     Cavendish

27.     Defendant Cavendish Farms Ltd. is a part of the J.D. Irving Group of Companies, with its headquarters in Dieppe, New Brunswick, Canada. Cavendish Farms is North America's fourth largest processor of Frozen Potato Products. Cavendish Farms Ltd. operates four potato processing plants, including one in Jamestown, North Dakota. Cavendish Farms sells Frozen Potato Products in the United States.

28.     Cavendish Farms, Inc., is a Delaware corporation with its principal place of business in North Dakota. "Cavendish Farms, Inc. is the United States-based subsidiary of Cavendish Farms Ltd."

29.     Cavendish Farms Ltd. and Cavendish Farms, Inc., are collectively referred to herein as "Cavendish Farms."

### 5.     Agents and Co-conspirators

30.     Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not named as defendants in this Complaint.

31.     Whenever reference is made to any act of a corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

32.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## III.     JURISDICTION, VENUE, AND COMMERCE

33.     This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 & 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, and the State laws cited herein.

34.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1337.

35.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claims.

36.     Venue is proper in this District under 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c), and (d) because, during the Class Period, Defendants resided, transacted business,

were found, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

37.     During the Class Period, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States and its territories.

38.     During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, wireless spectrum, and the United States Mail, to effectuate their illegal scheme.

39.     Defendants' conduct also had a substantial effect on the intrastate commerce of each of the United States and the District of Columbia.

40.     This Court has personal jurisdiction over each Defendant because each Defendant transacted business, maintained substantial contacts, and is located and/or committed unlawful conduct in this District. Defendants' unlawful scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in this District.

## IV.     ALLEGATIONS OF FACT SUPPORTING THE CLAIM FOR RELIEF

### A.     Frozen Potato Products

41.     Frozen Potato Products, including french fries, are ubiquitous food items in the United States. A study for the National Potato Council estimated that the entire potato sector contributed $100.9 billion to the economy in 2021, and added $53.5 billion to the United States Gross Domestic Product. Of that $100.9 billion contribution, the Potato Council estimated $49.1 billion came from processing, wholesaling, and retail efforts. More than two thirds of the potatoes sold in the U.S. in 2018 were used for processing. "Food service is an especially important outlet for potatoes primarily in the form of fries."

42.     About 39% of United States potatoes are frozen and become part of the Frozen Potato Products market. Another 26% of potatoes are sold fresh. Another 22% become potato chips. Another 7% are dehydrated, and 4% are sold refrigerated. The United States is the world's fifth largest potato producer.

43.     Frozen french fries provide the largest part of the Frozen Potato Products market. One source found 579,303 restaurants in the United States feature french fries on their menu. Along with french fries, the Frozen Potato Products market includes hash browns, tater tots, and potatoes that are frozen and shaped in other formats.

44.     The United States produces most of the potatoes it uses for its Frozen Potato Products. For example, for 2023, the United States produced slightly over 17 billion pounds of potatoes for freezing. By comparison, the United States imported 6.39 billion pounds of potatoes for freezing that year.

45.     Mot of the potatoes produced in the United States are used for Frozen Potato Products. For example, for 2023, the United States produced slightly over 17 billion pounds of potatoes for freezing. By comparison, the United States imported 6.39 billion pounds of potatoes for freezing that year.

46.     Imported Frozen Potato Products predominantly come to the United States from Canada. For example, for the 2019 to 2020 market year, the United States imported approximately $750 million worth of frozen French fries from Canada. Of Canada's Frozen Potato Products exports, it sends 91 percent of those exports, measured by Canadian dollars, to the United States. McCain Foods and Cavendish Farms are responsible for a significant portion of Frozen Potato Products exported to the United States each year.

47. Frozen Potato Products provide business advantages to restaurants that use them. For a restaurant, making good fries from scratch requires both increased horizontal workspace and increased labor to cut up the potatoes.

48. The foodservice sector is the largest buying segment Frozen Potato Products. This sector includes restaurants, hotels, schools, and hospitals, among other entities, which often purchase indirectly through distributors.

49. For example, Lamb Weston sells its Frozen Potato Products "to quick service and full-service restaurants and chains, foodservice distributors, non-commercial channels, and retailers." It sells to them through "a network of internal sales personnel and independent brokers, agents, and distributors to chain restaurants, wholesale, grocery, mass merchants, club retailers, specialty retailers, and foodservice distributors and institutions, independent restaurants, regional chain restaurants, and convenience stores." Similarly, McCain provides its products "to retailers, quick service restaurants, supermarket freezers and foodservice outlets worldwide."

**B.     Defendants Conspired to Fix Prices of Frozen Potato Products**

50. Defendants acted in concert to fix, raise, maintain, and stabilize the price of Frozen Potato Products they manufactured, distributed, sold, or imported into the United States. This unlawful conspiracy in restraint of trade began at least as early as January 1, 2021, and continues into the present.

51. Defendants' Frozen Potato Products prices tell a remarkable story because they would not have occurred in a competitive market that was free from Defendants' concerted action. Since Defendants collectively control 97% to 98% of the Frozen Potato Products market, changes in the industry price reflect Defendants' collective price changes to an unusual degree.

11

52.     Defendants' Frozen Potato Product prices increased in 2021 and then skyrocketed in 2022, and they continued to remain high through at least the end of July 2024, resulting in unparalleled margins for Defendants.

53.     These increased Frozen Potato Product prices cannot be adequately explained by cost inputs. From July 2022 to July 2024, Frozen Potato Product prices increased 47%. During that same two-year period, Defendants' input costs (*e.g.*, raw potatoes) declined. Defendants' input costs peaked around the third quarter of 2022, and declined substantially after that, but Defendants' Frozen Potato Product prices continued to rise. Defendants' prices remained near their peak from October 2023 through at least July 2024 despite a decline in input costs of about 33%. This comparison indicates that Defendants had for some time collusively raised and fixed their product prices including after their input costs declined.

54.     In May 2023, while Defendants' input costs were sliding downhill, two stock analysts predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not "be durable longer term." Contrary to that prediction, Defendants' prices continued to climb and remained uncompetitively high after their input costs had resettled at lower levels.

55.     The Frozen Potato Products price hikes in 2021 and 2022 were no accident. Rather, Defendants imposed matching, simultaneous or near-simultaneous price increases on their customers.

56.     The four Defendants—controlling 97% to 98% of the Frozen Potato Products market—acting in concert have extreme market power and the ability to control price. Therefore, if Defendants collectively raise their prices, that increase moves the market price.

57.     By raising and maintaining Frozen Potato Products prices, each Defendant, acting individually, risks one of its competitors undercutting its prices to gain market share. In short,

competition would not allow a single Frozen Potato Products manufacturer to elevate its prices to extreme levels beyond its input costs without one of its competitors undercutting that price and taking market share. That dynamic explains why analysts predicted that Lamb Weston's "stepped-up margin expansion" would not be "durable longer term." Defendants' price increase actions described herein are therefore inconsistent with their individual interests. By colluding, Defendants change their incentives and the incentives of their co-conspirators. Defendants followed their collective interests rather than their individual interests through their collective price increases.

58.     Prices for Defendants' Frozen Potato Products increased in lockstep during the Class Period.  Defendants' price adjustments initially focused on maintaining that company's profit margins, but that all changed. In February 2021, McCain announced a price increase that was soon followed by J.R. Simplot and Cavendish Farms. Lamb Weston did not formally announce a price increase at that time but was understood to increase prices more quietly in that same time period.

59.     J.R. Simplot's Sales Director acknowledged that Simplot previously considered pricing increases annually, but then started to increase prices more often. In 2021, Defendants began a series of "tit for tat" price increases with each other multiple times per year.

60.     In discussing a forthcoming Lamb Weston price increase in September 2021, Lamb Weston's former Vice-President knowingly predicted that competitor McCain would be pleased with the increase and follow suit: "it will probably be exactly the price increase that McCain wanted, which was $0.04 on A grade and $0.02 they will announce a price increase."

61.     Early the next year, on February 11, 2022, Lamb Weston announced that it would increase prices to take effect in April, increasing prices on "battered and coated" products by twelve cents per pound and adding ten cents per pound on non-battered products.

62.     Just four days later, on February 15, 2022, J.R. Simplot announced the same increase on the same two categories of products, and McCain announced a twelve cent per pound increase on all its frozen potato products.

63.     Then, one day later, on February 16, 2022, Cavendish Farms announced a price increase of twelve cents per pound for battered and coated frozen potatoes and "formed items," as well as non-battered frozen potatoes.

64.     On April 19, 2022, the owner of Ivey and Coney, a Washington, D.C. restaurant, posted on X (formerly Twitter) that Defendants had informed it of uniform price increases, all effective on April 4, 2022. The owner's post said, "Amazing how all of the major suppliers for French Fries and the like are all raising their prices at the same time and by the same amount." The post added, "Totally not collusion or anything, right?"

65.     Additionally, the Director of Sales at J.R. Simplot acknowledged Defendants' lockstep price increases, noting that in 2022, "that's what we did . . . . like Lamb, they did the $0.10 and $0.12 like we did in April of 2022." He noted that J.R. Simplot took a price increase in May 2022, and Lamb took a similar price increase of $0.08 and $0.10 in July 2022.

66.     In 2022, in furtherance of the conspiracy, McCain Foods figuratively "tore up" its contracts and increased all prices to a 30% margin, regardless of their contracts' remaining durations—an enormous margin a company would not be able to capture if it had to compete on price. The price increase was a "strong arm" approach, enforced because customers had no

bargaining leverage and therefore could not contest the price increases. This change was implemented by McCain Foods' upper-level management.

67.     McCain and Lamb Weston could not enforce such substantial price increases without the pricing solidarity of J.R. Simplot and Cavendish Farms. Absent solidarity between all competitors, an individual company's price increase would have been undercut by the other competitors and used to win sales and gain market share by maintaining lower prices. Defendants' price increases continued to conform with each other's, and Defendants have collectively raised and maintained prices at supra-competitive levels, including through price increases in 2023, to the detriment of Plaintiff and other indirect purchasers of Frozen Potato Products. In 2023, the Director of Sales Solutions for J.R. Simplot acknowledged that Lamb Weston took 35% in price increases and explained that J.R. Simplot, McCain, and Cavendish were also continuing to "push pricing" and "not going after new business."

68.     Indeed, Defendants have experienced margins they could not have enjoyed but for their conspiracy. In 2023, the then-former VP of International at Lamb Weston acknowledged that Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history of the potato industry." He explained that Defendants "absolutely" have "no incentive to fight that hard for each other's share"; instead, they are all "behaving themselves" in order to maintain high margins. He remarked that "I think we've done a pretty good job at taking margins with these price increases."

69.     A former Senior Director at McCain Foods' 2024 statement reflected similar price coordination. He noted McCain Foods was unwilling to compete with Lamb Weston on the price of battered fries. He said that he originally thought McCain should compete and pursue more market share for that product, but "the higher ups in the room" said not to risk it.  Similarly, J.R.

Simplot's Director of Sales noted that a couple of customers threatened to switch to one of Simplot's competitors after Simplot increased its prices, "but we knew we weren't worried about it." In short, Defendants had confidence in their solidarity; they knew their co-conspirators would not undercut them on price.

70.    Defendants' collusion reaped significant rewards as they implemented coordinated price hikes and continued to increase prices in the United States, as they intended, while their input costs plummeted. Indeed, by Lamb Weston's Former VP of International's own account, they had "never ever seen margins this high."

### C.    The Structure and Characteristics of the Frozen Potato Product Industry are Conducive to Conspiracy

#### 1.    Consolidation Made the Industry Highly Concentrated

71.    A concentrated market facilitates collusion in at least three ways. First, it gives a cartel of sellers more collective bargaining power by reducing buyers' alternatives. Second, communicating and agreeing upon collective action among fewer sellers requires less time and attention. Third, monitoring and policing the agreement among a smaller group of sellers is easier.

72.    The market for Frozen Potato Products has grown highly concentrated. Two decades ago, there were approximately sixteen different companies with meaningful presence in the market; but those players have increasingly merged or otherwise consolidated their market share. That consolidation, as Defendants have admitted publicly to investors and otherwise, has resulted in rising prices and rising margins.

73.    The four Defendants control 97% to 98% of the Frozen Potato Products market: Lamb Weston Holdings controls 40%; McCain Foods Ltd. controls 30%; J.R. Simplot Co. controls 20%; and Cavendish Farms Corp. controls 7% to 8%.

74.     All other market participants account for only 2% to 3% of the Frozen Potato Products Market.

75.     Markets as consolidated as the Frozen Potato Products market present significant concerns for anticompetitive effects on purchasers.

### 2. Barriers to Market Entry Are High

76.     High barriers to entering a market facilitate collusion in that market. Price increases and supra-competitive profits can attract other potential competitors, but high entry barriers make their market entry slower, riskier, and less likely to succeed, deterring competition. The Frozen Potato Products market's high entry barriers facilitate Defendants' collusion.

77.     One barrier here is that competitively entering the Frozen Potato Products Market would require extensive capital. For example, Cavendish Farms planned to spend about $293 million on a new frozen potato processing plant it announced in 2017 and spent $430 million building a new plant in Alberta, Canada, in 2019. Such necessary start-up costs and investments to participate in the Frozen Potato Products market deter new market entry.

78.     Another barrier is that entering the Frozen Potato Products Market takes significant time, meaning that a new market entrant could not start operating and profiting immediately. For example, J.R. Simplot expected completion of one new plant in Washington to take two years.

79.     Another barrier is that Defendants' extensive relationships with potato growers in the low-cost basin of the Pacific Northwest would make it difficult to obtain the raw potatoes necessary to compete in the Frozen Potato Products Market. When asked about competitors entering the Washington-Oregon growing area, a former Lamb Weston executive remarked there were "only so many potatoes to go around in the basin area." The executive stated that new competitors had tried to enter the market in the past but did not survive. A stock analyst similarly noted the Idaho-Washington basin region's "minimal unused land and water resources," Lamb

Weston's advantage in that area, and all four Defendants' long-standing contractual relationships with the potato farmers in that region, which add barriers to entering the market.

### 3. Food Operators on the Buy-Side of the Market Are Fragmented.

80.     Having numerous buyers for a product supports seller collusion by giving the sellers more collective bargaining power and making it harder for buyers to monitor sellers' conduct. Several segments of buyers for Frozen Potato Products are fragmented in this way.

81.     About half of the $1.5 trillion United States food sector operates in the retail segment, where grocery and convenience stores provide food to consume at home. The other half of the food sector operates in the growing food service segment, selling food to consume away from home in restaurants, workplaces, schools, and other locations.

82.     As of 2019, the United States had 1,249,737 food operators. Of these operators, retail food service firms like supermarkets and convenience stores accounted for 264,125 units. Restaurants provided 648,462 food operator locations. On-site food service operations, such as schools, colleges, hospitals, nursing homes, workplace cafeterias, caterers, lodging and recreation, and military sites, accounted for another 337,150 sites.

83.     Before, 2020, the National Restaurant Association estimated the United States had over one million restaurants. As of 2023, after the main Covid-19 era, there were an estimated 749,000 restaurants.

84.     Nine out of ten restaurants have fewer than fifty employees. Seven in ten restaurants are single unit operations.

85.     Producers like Defendants also sell their production to food service operators through wholesalers and other distributors. Such distributors break down orders from producers, provide warehousing, logistics and transportation, and sell usable quantities of the products to

operators. The distributor segment has a competitive market structure and has been described as "highly fragmented." One report found 17,100 United States food distribution locations.

### 4. Demand for Frozen Potato Products Is Inelastic.

86.     "Elasticity" describes the sensitivity of supply and demand to changes in price or quantity such that demand is "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. With inelastic demand, those customers have nowhere to turn for alternative, cheaper products of similar quality, so they continue to purchase despite a price increase.

87.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would cause unduly declining sales, revenues, and profits, as customers purchase substitute products or decline to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

88.     Demand for Frozen Potato Products is highly inelastic. When the price of potatoes increases, the quantity demanded decreases by only a smaller percentage. Frozen french fries, in particular, are an important offering for food services and restaurants, so processors can raise prices without hurting demand. Lamb Weston CEO Thomas P. Werner said in April 2022 that they "haven't seen" the elasticity for french fries. This comment indicates that at least Lamb Weston's price increases did not reduce its sales. In other words, Frozen Potato Products' demand is highly inelastic. Because the price for Frozen Potato Products is highly inelastic, Defendants were able to and did collectively raise prices to supra-competitive levels without losing revenue.

19

5. **Frozen Potato Products, including French Fries, Are Not Easily Substituted**

89.     Collusion is also more likely if other products cannot easily substitute for the products in question. Frozen Potato Products lack substitutes in the United States, particularly for food service customers. For example, french fries are the most profitable food item for restaurants, and diners expect to see them on the menu.

6. **Frozen Potato Products Are Commodity Products.**

90.     Defendants make similar Frozen Potato Products, and Frozen Potato Products do not differ significantly in quality, appearance, or use. As a result, Frozen Potato Products are functionally interchangeable and considered a commodity product. For example, the Federal Reserve analyzes Frozen Potato Products as a "Producer Price Index by Commodity." In fact, executives from both McCain Foods and Lamb Weston referred to the market or industry as a "mature" market, one characteristic of which is homogeneous product offerings.

91.     When products are interchangeable, the primary way to compete is on the basis of price. The avoidance of price-based competition is the primary motivation for forming a cartel. Thus, cartels are more likely when the participants sell interchangeable products. Where products like Frozen Potato Products are interchangeable, economics suggest that cartel behavior is facilitated because, *inter alia*, cartel members can more easily monitor and detect defections from a price-fixing agreement.

7. **Opportunities to Conspire**

92.     Opportunities for collusion facilitate price-fixing by providing cartelists with otherwise legitimate-appearing opportunities to discuss prices and production. Communications among competitors can therefore provide circumstantial evidence of price-fixing. As described

below, the Frozen Potato Products industry features both co-packing arrangements and trade association meetings that provided Defendants with opportunities to collude.

93.     In so-called "co-packing" arrangements, a manufacturer outsources part of its production to another company and then sells the products the other company has made.  Co-packing agreements give manufacturers an opportunity to discuss prices and their production quantities with each other while discussing their arrangements.

94.     Lamb Weston has admitted that it sources part of its production to other companies in co-packing arrangements. It called co-packing "a common industry practice." Later, it stated there "are a limited number of competent, high-quality co-packers in the industry," and having to make alternative arrangements might be unsatisfactory and could affect their ability to "implement our business plan or meet industry demand."

95.     Defendants also share membership in multiple trade organizations in this industry.  For example, McCain, Lamb Weston, and J.R. Simplot are all members of the Potato Association of America. The "paramount objective" of the Potato Association of America is the "collection and dissemination of the best available technical and practical information relating to all aspects of potato production, biology, and utilization." The Potato Association of America "serves as the official professional society for those involved in potato research, extension, production, and utilization." The Potato Association of America hosts a multi-day meeting each year of industry participants, including Defendants. For example, the Association held its 2022 meeting from July 17 to 22, 2022, in Missoula, Montana, its 2023 annual meeting from July 23 to 27, 2023, in Charlottetown, Prince Edward Island, and its 2024 meeting in Portland, Oregon. The 2025 meeting is scheduled for July 27 to 31, 2025, in Madison, Wisconsin.

96.     Lamb Weston, McCain, J.R. Simplot, and Cavendish Farms are also all members of the National Potato Council. The National Potato Council "is the voice of U.S. potato growers and industry members" in Washington D.C. The National Potato Council advances and protects potato growers' interests in Washington, D.C. "by addressing issues that affect the potato industry, from policy issues debated in Congress to regulatory issues proposed by federal agencies."

97.     The National Potato Council held its Potato Expo 2021 from January 5 to 7, 2021 as a virtual event. The Council described its event, saying "[e]ach year, the Potato Expo brings together growers, suppliers and industry experts to make the largest conference and trade show for the potato industry."

98.     In addition, three of the Defendants have executives on the board of directors of the Potato Sustainability Alliance. As of August 27, 2024, those board members were Richard Burres (Lamb Weston), Spencer Karabelas-Pittman (McCain Foods), and John MacQuarrie (Cavendish Farms).  As of November 4, 2024, Richard Burres (Lamb Weston), Audrey Leduc (McCain Foods), John MacQuarrie (Cavendish Farms), and Jolyn Rasmusen (J.R. Simplot) sit on that board of directors.

99.     The industry's common co-packing arrangements and the above contact at industry trade events gave Defendants opportunities to meet and conspire about their prices for and production of Frozen Potato Products. In addition, it follows from these contacts that Defendants' executives were aware of where their co-conspirators bought and sold their Frozen Potato Products.

100.    Defendants' executives also sit on the board of directors of the American Frozen Food Institute (AFFI). AFFI's 2024 board of directors includes Tina Almond

(McCain Foods USA), Michelle Damon (J.R. Simplot Foods), Peter D. Johnston (Cavendish Farms Corporation), and Jennifer Weekes (Lamb Weston).

101.    AFFI's web site describes its "AFFI-CON" event as the "premier frozen ingredients show that brings together over 500 companies and 1,500+ attendees in a single location, allowing them to meet one-on-one to discuss current and future business opportunities. The average attendee will have 40+ private business meetings that will lay the foundation for their year." The next meeting is scheduled for February 22 to 25, 2025, at the Hyatt Regency Dallas, in Dallas Texas.

102.    In addition, all Defendants participate in PotatoTrac, an industry service run through NPD Group, Inc., now known as Circana ("NPD"), a corporation which "provides market information, tracking, analytic, and advisory services to help clients in making better business decisions." Defendants either sell or supply NPD Group, Inc. with their company-specific ship data. PotatoTrac/NPD then sends Defendants one another's market share information so that each knows where they and their competitors "sit" within the industry. Potato Trac's commercial clients are limited to the four defendants. On information and belief, PotatoTrac also includes company projections. Each of the Defendants willingly share its commercial data and information with PotatoTrac/NPD, knowing that the only other commercial industry participants are its major Frozen Potato Products competitors. By knowing and monitoring each other's "share" information, Defendants are disincentivized to compete on price or for market share. Instead, they can keep Frozen Potato Prices artificially high and monitor their conspiracy.

**D. The Conspiracy and Overt Acts in Furtherance Proximately Caused Plaintiff and Members of the Class to Suffer Antitrust Injury and Damages**

103.    Because of Defendants' anticompetitive conduct: (1) competition in the Frozen Potato Products market has been reduced or eliminated, (2) prices for Frozen Potato Products have been maintained at supra-competitive levels, and (3) United States purchasers of Frozen Potato Products have been deprived of the benefit of price competition.

104.    As a result of Defendants' anticompetitive conduct, Plaintiff and Class members paid more for Frozen Potato Products than they otherwise would have and thus suffered antitrust injury and damages.

**V.    CLASS ACTION ALLEGATIONS**

105.    Plaintiff brings this action on behalf of itself, and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of the following Classes, which consist of a Nationwide Class, Nationwide Repealer Subclass, Nationwide Restitution Subclass, and Massachusetts Subclass (collectively, "Class"), as follows:

a)    Nationwide Class: All persons and entities in the commercial foodservice sector that purchased Frozen Potato Products indirectly from a Defendant in the United States during the Class Period.

b)    Nationwide Repealer Subclass: All persons and entities in the commercial foodservice sector that purchased Frozen Potato Products indirectly from a Defendant in Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, Wyoming, or the District of Columbia, during the Class Period.

c)    Nationwide Restitution Subclass: All persons or entities in the commercial foodservice sector that purchased Frozen Potato Products indirectly from a Defendant in the United States, other than in Indiana or Ohio, during the Class Period.

    d)   Massachusetts Subclass: All persons or entities in the commercial foodservice sector that purchased Frozen Potato Products indirectly from a Defendant in Massachusetts during the Class Period.

106.    "Class" as defined herein, includes, and subsumes the Nationwide Class, the Nationwide Repealer Subclass, the Nationwide Restitution Subclass, and the Massachusetts Subclass.

107.    Excluded from the Class are Defendants and each of their respective officers, directors, management, employees, subsidiaries, and affiliates. Also excluded is the Judge presiding over this action, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

108.    Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Class are readily identifiable from information and records in the possession of Defendants.

109.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same conspiracy of Defendants.

110.    Plaintiff will fairly and adequately protect and represent the interests of members of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of members of the Class.

111.    Plaintiff is represented by counsel with substantial experience and success in the prosecution and leadership of antitrust class actions and other complex litigation, including class actions involving agricultural food staple products and other commodities, indirect purchaser cases, and consumer protection litigation.

112.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class, thereby making damages with respect to members of the Class as a whole appropriate.

113.     Questions of law and fact common to members of the Class include, but are not limited to:

- Whether Defendants engaged in a combination or conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Frozen Potato Products in the United States;

- Whether Defendants agreed to unreasonably restrain trade in violation of federal and or state antitrust or consumer protection laws;

- The scope and duration of the alleged conspiracy;

- The effect of the alleged conspiracy on the price of Frozen Potato Products during the Class Period;

- The type of injury suffered by Plaintiff and members of the Class;

- Whether the statute of limitations was tolled or whether Defendants fraudulently concealed the existence of their anticompetitive conduct from Plaintiff and the members of the Class;

- The extent to which Defendants were unjustly enriched;

- Aggregate damages suffered by Plaintiff and members of the Class; and

- Whether Defendants acted or refused to act on grounds generally applicable to members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to members of the Class as a whole.

114.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the

unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.

115.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in management of this class action.

116.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

117.    Plaintiff has defined members of the Class based on currently available information and hereby reserve the right to amend the definition of members of the Class, including, without limitation, the Class Period.

## VI.    CLAIMS FOR RELIEF

### COUNT I:
### PRICE FIXING

### Section 1 of the Sherman Antitrust Act
### 15 U.S.C. § 1

118.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

119.    Defendants formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to raise, fix, maintain, or stabilize Frozen Potato Products prices.

120.    Since at least 2021, Defendants agreed with each other to raise, fix, maintain, or stabilize the prices of Frozen Potato Products. The agreement was intended to and did have the purpose and effect of unreasonably restraining trade, suppressing competition, raising, fixing, maintaining, or stabilizing prices in the Frozen Potato Products market in the United States.

121.     This conduct is unlawful under the per se standard. Defendants' conduct is also unlawful under either a "quick look" or rule of reason analysis because the agreement is factually anticompetitive with no valid procompetitive justifications. Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through less restrictive means of competition.

122.     Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

123.     Plaintiff and members of the Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## COUNT II:
## STATE ANTITRUST LAWS

124.     Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

125.     By reason of the foregoing, Defendants have violated, and Plaintiff and members of the Class are entitled to relief under:

  i.    Alabama, Ala. Code. § 6-5-60, *et seq*.

  ii.   Arizona, Ariz. Rev. Stat. § 44-1401, *et seq*.

  iii.  Arkansas, Ark. Code. Ann. § 4-75-211, *et seq*.

  iv.   California, Cal. Bus. & Prof. Code § 16700, *et seq*.

  v.    Connecticut, Conn. Gen. Stat. § 35-24, et seq.

  vi.   District of Columbia, D.C. Code § 28-4501, *et seq*.

  vii.  Georgia, Ga. Code. § 16-10-22, *et seq*.

viii.   Hawaii, Hawaii Rev. Stat. § 480-1, *et seq*.

ix.   Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, *et seq*.

x.   Iowa, Iowa Code § 553.1, *et seq*.

xi.   Kansas, Kan. Stat. Ann. § 50-101, *et seq*.

xii.   Maine, Maine Rev. Stat. tit. 10, § 1101, *et seq*.

xiii.   Maryland, Md. Code, Comm. Law § 11-201, *et seq*.

xiv.   Michigan, MCL § 445.773, *et seq*.

xv.   Minnesota, Minn. Stat. § 325D.49, *et seq*.

xvi.   Mississippi, Miss. Code Ann. § 75-21-1, *et seq*.

xvii.   Nebraska, Neb. Rev. Stat. § 59-801, *et seq*.

xviii.   Nevada, Nev. Rev. Stat. § 598A.010, *et seq*.

xix.   New Mexico, N.M. Stat. Ann. § 57-1-1, *et seq*.

xx.   New York, N.Y. Gen. Bus. Law § 340, *et seq*.

xxi.   North Carolina, N.C. Gen. Stat. § 75-1, *et seq.*

xxii.   North Dakota, N.D. Cen. Code § 51-08.1-01, *et seq*.

xxiii.   Oregon, Or. Rev. Stat. § 646.705, *et seq*.

xxiv.   Rhode Island, R.I. Sat. § 6-36-1, *et seq.*

xxv.   South Carolina, S.C. Code Ann. § 39-3-10, *et seq*.

xxvi.   South Dakota, S.D. Cod. Laws § 37-1-3.1, *et seq*.

xxvii.   Tennessee, Tenn. Code Ann. § 47-25-101, *et seq*.

xxviii.   Utah, Utah Code. Ann. § 76-10-3101, *et seq*.

xxix.   Vermont, 9 V.S.A. § 2453a(a)

xxx.   West Virginia, W.V. Code § 47-18-1, *et seq*.

xxxi.   Wisconsin, Wisc. Stat. § 133.01, *et seq*.

xxxii.  Wyoming, Wyo. Stat. Ann. § 40-4-101, *et seq*.

## COUNT III:
## STATE CONSUMER PROTECTION LAWS

126.    Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

127.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the Class are entitled to relief under:

i.    Alaska, Alaska Stat. § 45.50.531.

ii.   Arizona, Ariz. Rev. Stat. §§ 44-1521, *et seq*.

iii.  Arkansas, Ark. Code §§ 4-88-101, *et seq*.

iv.   California, California Bus & Prof. Code §§ 17200, *et seq*.

v.    Connecticut, Conn. Gen. Stat. § 42-110, *et seq*.

vi.   District of Columbia, D.C. Code Ann. §28-3901, *et seq*.

vii.  Florida, Fla. Stat. § 501.201, *et seq*.

viii. Hawaii, Hawaii Rev. Stat. § 480-2, *et seq*.

ix.   Kansas, Kan. Stat. Ann. § 50-623, *et seq*.

x.    Massachusetts, Mass. Gen. Laws, chapter 93A § 1, *et seq.*

xi.   Michigan, Mich. Comp. Laws § 445.901, *et seq*.

xii.  Minnesota, Minn. Stat. § 325F.69, *et seq*.

xiii. Mississippi, Miss. Code § 75-24-1, *et seq*.

xiv.  Missouri, Mo. Rev. Stat. § 407.020.

xv.   Nebraska, Neb. Rev. Stat. §§ 59-1601, *et seq*.

xvi.  Nevada, Nev. Rev. Stat. §§ 598.0903, *et seq*.

xvii.   New Hampshire, N.H. Rev. Stat. §§ 358-A:1, *et seq.*

xviii.   New Jersey, N.J. Stat. § 56-8-1, *et seq.*

xix.   New Mexico, N.M. Stat. Ann. §§ 57-12-1, *et seq.*

xx.   New York, N.Y. Gen. Bus. Law § 349, *et seq.*

xxi.   North Carolina, N.C. Gen. Stat. §§ 75-1.1, *et seq.*

xxii.   Rhode Island, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

xxiii.   South Carolina, S.C. Code Ann., §§ 39-5-10, *et seq.*

xxiv.   Vermont, 9 V.S.A. § 2453a

## COUNT IV:
## UNJUST ENRICHMENT

128.   Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

129.   Defendants financially benefited from their unlawful acts at the expense of Plaintiff and members of the Class, who paid supra-competitive prices for Frozen Potato Products during the Class Period.

130.   It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution to Plaintiff and members of the Class.

131.   Defendants should be made to disgorge their ill-gotten gains to a constructive trust created for the benefit of Plaintiff and members of the Class, from which Plaintiff and members of the Class may obtain restitution.

132.   By reason of the foregoing, Plaintiff and members of the Class are entitled to relief under the laws of all states and the District of Columbia, other than Indiana and Ohio.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and members of the Class, respectfully prays that This Honorable Court:

A.      Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that it be named a Class Representative, that the undersigned be named Lead Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.      Adjudge that Defendants violated federal antitrust laws, as set forth above;

C.      Adjudge that Defendants violated State antitrust and trade regulation laws, as set forth above;

D.      Award Plaintiff and members of the Class actual, treble, punitive, and exemplary damages; attorneys' fees and costs of suit, including costs of consulting and testifying experts; and pre- and post-judgment interest;

E.      Order disgorgement and restitution;

F.      Enjoin Defendants from their continuing violations of federal and state law;

G.      Grant prospective injunctive relief, including structural relief, to prevent and restrain any future violations of law;

H.      Grant such other, further, and different relief as may be just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a Trial by Jury as to all issues so triable.

Dated: February 19, 2025        By:  */s/ Samuel J. Strauss*
Samuel J. Strauss
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com

Stacey P. Slaughter
Caitlin E. Keiper
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 349-4181
sslaughter@robinskaplan.com
ckeiper@robinskaplan.com

*Counsel for Plaintiff and the Proposed Class*